THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHN C. JACKSON, Defendant-Appellant.

First District (5th Division)   No. 62421

Opinion filed August 27, 1976.

James Geis and Ira A. Moltz, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Jeffrey Singer, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

A jury found defendant guilty of murder and, on appeal, he contends only that he was denied effective assistance of counsel when his privately retained attorney changed his theory of defense at trial.

The indictment charged that defendant committed the offense of murder in that he intentionally and knowingly shot and killed Cornell Howard without lawful justification.

The only occurrence witness called by the State was Willie Jordan, who testified that on the night in question he and Howard were standing in front of a tavern when Larry Members appeared and asked Howard if he wanted to fight. Jordan, Howard and Members were cousins. Members continued in his effort to start a fight, but Howard refused to be involved. During this verbal sparring, defendant attempted on two occasions to stop the altercation because they were "kinfolk." Members, however,

persisted and the witness stated he also tried to stop the argument but was pushed away by Members. Two other cousins, Minnie and Mae Brown, also attempted to break up the fight, but to no avail. After Members had pushed Howard two or three times, the latter drew a gun and fired twice into the ground, stating that if he wasn't left alone he would kill Members. The witness and Members started to leave, when he heard shots and saw Howard fall. He looked around and saw defendant on the steps of the tavern, with a gun in his right hand pointed in the direction of Howard. He did not observe defendant fire any shots.

On cross-examination, defendant's counsel sought to inquire whether Jordan knew of a fight involving Howard, Members and one Otis Brown the week before during a dice game. An objection was made to its relevancy and a side bar conference followed at which counsel stated he hoped to establish that at this dice game Howard had stated he was going to kill Larry Members and, because defendant knew of this threat, he had reason to believe that Howard might kill either Members or him. Counsel stated that this self-defense theory was predicated on his own defense and that of Members, who was a relative. The objection was sustained, however, because Jordan wasn't present at the dice game and could only have hearsay knowledge of any such threat.

A police officer testifying for the State said that he had talked to defendant in a waiting area at the hospital to which Howard had been brought and that defendant said he had not seen anything and did not know anything about the shooting. Another police officer also testified he had a conversation at the police station with defendant, who told him he had not done the shooting and that he had never owned a firearm. This officer also stated that defendant had been drinking but was not drunk, and that Howard had gunshot wounds in his back, in his right upper arm, in his right lower arm, and in the left side of his head.

Larry Members, the sole witness for the defense, testified that he was standing in front of a tavern on the night in question when Howard drove up with Jordan. He asked Howard about a threat the latter had made to him a week previously at the dice game. An objection was made to any testimony concerning something that occurred a week prior as being hearsay, and a conference in chambers followed. There, defendant's attorney stated that Howard had threatened Members the week before; that defendant knew of the threat to his nephew and this knowledge could have accounted for his behavior on the evening in question. After a lengthy discussion, the court stated it would allow the question to be answered only after a promise from defendant's attorney that testimony would be presented to show that Howard's threat to Members was known to defendant at the time of the shooting.

Defense counsel, however, stated that he didn't know whether

Members had told defendant of the threat because he had never talked to Members. He stated further that Members had been asked to come to his office before trial but did not keep the appointment. He said, however, that he had copies of two statements Members had given to the police. Upon inquiry by the court as to whether he had discussed this area of defense with defendant, he replied "somewhat." Counsel was then asked whether defendant had indicated "that you may be able to tie up testimony of Larry Members with the defendant's state of mind at the time of the shooting," to which he replied that he was not sure. The court then gave him ten minutes to discuss this question with his client, after which counsel stated, "I think we definitely can tie it up." The court then allowed inquiry as to the threat by Howard.

Members testified that he was in a "crap game" the prior weekend with Howard and Otis Brown. There, he and Brown had an argument, after which "Cornell [Howard] said to Otis that if it was him, he would have shot me," meaning apparently that if Members had said to Howard the things he said to Otis, that Howard would have shot him. Members stated that he and Howard had a few words before he left and that he did not see Howard again until the evening of the shooting, when he asked Howard what he meant the prior week when he said he would have shot him. He and Howard argued, and defendant tried to stop them, but both of them told defendant to stay away. During the course of the argument he pushed Howard, who reached in his back pocket, pulled out a pistol and fired twice, with one bullet striking Members in the leg.

When this shooting occurred, Members turned and started into the tavern but changed his mind and ran in the opposite direction. The police later took him to the hospital, where he said he was treated for a bullet wound. On cross-examination, Members corroborated defendant's two efforts to break up the argument, and he stated that Howard did not at any time on the evening of the shooting threaten to kill or harm either defendant or Members. When the defense rested, without calling defendant to the stand, the State made a motion that Members' testimony regarding the threat at the "crap game" be stricken, because it had not been shown, as counsel had promised, that knowledge of the threat had ever been conveyed to defendant. The motion was granted, and the jury was instructed to disregard that testimony.

In closing argument, defense counsel pointed out that no one had actually seen defendant shoot Howard, and he argued that this fact was not proven beyond a reasonable doubt. In its rebuttal argument, the State commented that in opening statement defense counsel had stated defendant had done the shooting, but in self-defense; whereas, in closing argument, he argued that defendant had not been proven guilty beyond a reasonable doubt.

820

██ █ It is defendant's sole contention that he was deprived of effective assistance of counsel "when his attorney altered the defense theory in the midst of trial, due to counsel's failure to interview the sole defense witness or the defendant prior to trial." He says that his attorney told the jury in opening statement that he shot Howard and then, in closing argument, he took the position that the State did not prove beyond a reasonable doubt that defendant shot Howard. In defendant's brief, it is stated that this change in defenses "destroyed Mr. Jackson's credibility in the eyes of the jury and irreparably prejudiced his cause."

Whenever a court in good faith appoints or accepts the appearance of a member of the bar in good standing to represent a defendant in a criminal proceeding, the presumption is that the counsel is competent. (*United States v. Ragen* (7th Cir. 1948), 166 F.2d 976; *People v. Reeves* (1952), 412 Ill. 555, 107 N.E.2d 861.) This presumption will be overcome only by strong and convincing proof of incompetency. (*Beck v. State* (Ind. 1974), 308 N.E.2d 697.) In order to warrant a reversal, because of incompetency of counsel, actual incompetence must be clearly established and substantial prejudice result therefrom without which the outcome would probably have been different. (*People v. Morris* (1954), 3 Ill. 2d 437, 121 N.E.2d 810; see also *People v. Witherspoon* (1973), 55 Ill. 2d 18, 302 N.E.2d 3; *People v. Goerger* (1972), 52 Ill. 2d 403, 288 N.E.2d 416.) It has also been held that a claim of prejudice cannot be based on mere conjecture. (*Witherspoon; People v. Thomas* (1972), 51 Ill. 2d 39, 280 N.E.2d 433.) While it has been said that for a defendant to have been denied effective assistance of counsel, it must be shown that what was or was not done by the defendant's attorney made the proceedings "a farce and a mockery of justice shocking to the conscience of the Court" (*O'Malley v. United States* (6th Cir. 1961), 285 F.2d 733-734), this heavy standard was not meant to be an impenetrable obstacle to a meaningful analysis of the facts of any particular case (*United States v. Hager* (8th Cir. 1974), 505 F.2d 737). Thus, the "mockery of justice" standard is not to be taken literally, but rather is to be employed "as an embodiment of the principle that a petitioner must shoulder a heavy burden in proving unfairness." (*McQueen v. Swenson* (8th Cir. 1974), 498 F.2d 207, 214.) In the final analysis, the question of whether or not a defendant was adequately represented by competent counsel must be answered solely from the circumstances of each particular case. *Witherspoon; People v. Harper* (1969), 43 Ill. 2d 368, 253 N.E.2d 451.

██ Defendant argues that if Members had been interviewed before trial, his counsel would have learned that self-defense could not be established, and he would not have raised that defense in opening statement—and thus would not have been required to present, to

defendant's prejudice, the contradictory reasonable doubt defense in closing argument.

We initially note that the reasonable doubt defense was in the case from the beginning. The trial judge, on numerous occasions during the voir dire examination of the jurors, informed them that guilt must be established beyond a reasonable doubt. He also read the indictment, which charged defendant with the offense of murder in that he intentionally and knowingly killed Howard with a gun without reasonable justification, after which he informed the jurors that defendant was presumed innocent and that his guilt must be proved beyond a reasonable doubt.

The record discloses also that the prosecutor told the jury, in his opening statement, of the altercations between Howard and Members and of defendant's efforts to separate them. He stated that Howard had a gun and fired two shots into the ground in an effort to get Members to leave him alone, and the prosecutor then said that as Howard started to leave the area he was shot by defendant. In the opening statement of defendant's counsel which followed the above stated remarks by the court and the prosecutor, defendant's counsel first discussed the term "without legal justification," as used in the indictment, and then told in some detail of the threat made a week prior by Howard that he would kill Members. He spoke in considerable detail of the altercation between Howard and Members and of defendant's efforts to separate them. He told the jurors that Howard took out a gun and shot Members, and then he made the following statement as to defendant's actions:

> "And as he tried to separate them then he again, the shooting, the gun was in his hand and he took out a gun and there was some shooting both ways [sic]. That is what happened. Therefore, we say that the evidence will show no question in anybody's mind that the shooting was with legal justification."

It appears to us that in his opening statement, defendant's counsel was attempting to leave the impression with the jurors that there was some question as to who had done the shooting, but that, if defendant had done so, it was legally justified. In any event, the opening statement indicates he had informed himself in some detail concerning the occurrence involved here and, there being no indication in the record to the contrary, we assume this information came from his client. Likewise, it may be assumed that defendant told his attorney that he knew of Howard's threat to Members. This can be reasonably concluded from the fact that his counsel left the conference in the court's chambers to determine, at the request of the court, whether he would be able "to tie up testimony of Larry Members with the defendant's state of mind at the time of the shooting" and, after conferring with his client, he informed the court that it could be tied up.

When these assumptions are coupled with the fact that defendant's attorney had the benefit of two statements taken from Members, we cannot agree with defendant that substantial prejudice resulted from the failure of his attorney to interview Members.

In situations such as this, the question is not whether the trial was perfect, but whether defendant received a fair trial. (*People v. Wesley* (1964), 30 Ill. 2d 131, 195 N.E.2d 708.) That question must be resolved not from isolated instances during the course of the trial, but from a careful consideration of the entire proceedings and from an examination of the totality of the facts in a given case. *People v. De Simone* (1956), 9 Ill. 2d 522, 138 N.E.2d 556.

■■ It is significant here that no other instances of alleged incompetency are suggested and, from our review of the record, we believe that defendant received effective assistance of counsel. In addition, we note that he effectively interrogated the jurors on the voir dire examination; that objections to testimony were timely and appropriate; that his cross-examination of the State's witnesses and his interrogation of the defense witness were handled competently; that he submitted proper instructions; and that he made a professionally suitable closing argument.

In view of the foregoing, we conclude from the totality of the circumstances here that defendant did not establish incompetency of his counsel and that, in our opinion, he did receive a fair trial.

The judgment is affirmed.

Affirmed.

BARRETT and DRUCKER, JJ., concur.